Exhibit
1

COMMONWEALTH OF VIRGINIA
VIRGINIA DEPARTMENT OF EDUCATION
DIVISION OF SPECIAL EDUCATION & STUDENT SERVICES
OFFICE OF DISPUTE RESOLUTION AND ADMINISTRATIVE SERVICES

**Re:** Child, by and through his parent(s), Parent v. County Public Schools

Case No. 24-097, 116, 118

**Child & Parent(s)/Guardian:**
child
parent

**Administrative Hearing Officer:**

**Child's Attorney/Advocate(s):**
Advocate

**County Public Schools' Attorney**
Attorney for LEA

**Superintendent of Henrico County Public Schools:**
Dr. Superintendent

## AMENDED DECISION[1]

### I.   Procedural History

On June 18 through 21, 2024, the Hearing Officer held a due process hearing (DPH) on issues involving three due process complaints (DPC) the parent filed. Parent filed the first complaint on April 8, 2024. Parent amended the complaint on May 3, 2024. Parent then filed a second complaint on May 10, 2024. This Hearing Officer was appointed as the Hearing Officer on the complaint filed on May 10, 2024. Parent filed a third complaint May 16, 2024.[2] LEA moved for a consolidated hearing on the three complaints. The Hearing Officer determined that the complaints involved the same parties, the issues arise out of the same operative facts, and the witnesses are the same. Moreover, the parties agreed to a consolidated hearing on the issues.

Accordingly by order issued on May 24, 2024, the Hearing Officer ruled that the due process hearings on the complaints would be consolidated.

The Hearing Officer held the consolidated hearing on the complaints on June 18 through 21, 2024.

During the course of the hearing, each party presented an opening statement, presented witnesses on his/her/its behalf, and cross-examined witnesses of the opposing party if desired. The parties also presented closing arguments.[3]

---

[1] This decision has been amended to make clerical corrections to the initial decision issued on July 17, 2024.

[2] Resolution meetings for complaints filed on April 8, May 3, 10, and 16, were held on April 17, May 16, and May 21, 2024, respectively, as indicated in Hearing Officer's order issued on May 24, 2024, incorporated here.

[3] The Hearing Officer admitted those exhibits of the parties that were moved into evidence. For LEA those

## II.    ISSUES

After discussions about the issues with the parties and affording the parent's advocate's multiple opportunities to clarify the issues, the Hearing Officer determined by order issued June 10, 2024, and incorporated her that the issues before her for the consolidated due process hearing were the following:

**ISSUE 1:**    Did the assistant principal send the parent an attendance letter on or about May 2, 2024?  If so, was this action taken by the LEA a unilateral one and did the action circumvent holding an IEP meeting and addressing Student's attendance?  If so, was there a denial of FAPE?

**ISSUE 2.**    Did the LEA deny Student FAPE due to disability harassment based on attendance from January, 2024 to present?  Particularly, (i) did the LEA accept other sixth grade students' medical excuses to excuse their absences while not accepting Student's medical excuses and deeming her absences unexcused and (ii) did the LEA propose attendance meetings rather than scheduling IEP meetings to address Student's absences?

**ISSUE 3:**    Did the LEA note student's absences from school on October 6, 2023, and on or about February 1, 2024 to present as unexcused?  Should the LEA have identified Student's absences on October 6, 2023, and on or about February 1, 2024, to present as excused and provided for homebound instruction/homebound services during those times?  If not, has the LEA deprived the student of an educational benefit and denied FAPE?

**ISSUE 4.**    Did the LEA retaliate against the student from January 15, 2024, to present?  Specifically were the following acts retaliation:  limiting parent to five minutes on school property to communicate an emergency to Student; disregarding instructions of medical providers of Student; not providing for a case manager for Student; causing criminal charges for truancy to be lodged against Parent; drafting an IEP without parental input and input from Student's doctor and therapist; not providing a PWN?

Did the retaliation deny Student a FAPE?

**ISSUE 5:**    Did the LEA provide for homebased instruction or homebound services for the student on her IEP or an amendment to the IEP for a period beginning on or about January 2024 to present?    If not, did the LEA wrongfully deny homebase instruction/homebased services?  If so, has the student been denied a FAPE?

---

exhibits were A, 3, 4,5,6, 8, 9, 10, 11, 12, 13, 14, 15, 17 thru 30, 32 thru 37, 40, 41, 43, 44, 47, 48, 50, 52, and 53, and 54.  Parent's exhibits 1 through 26 were made a part of the record.  However, Parent indicated that exhibit 10 was a recording on a flash drive.  The Hearing Officer received no flash or thumb drive.  Additionally, as the Hearing Officer informed Parent's Advocate, a number of the parent's exhibits were not legible because pages had been significantly reduced in size and the print was so small it was not readable.

**ISSUE 6.**      Did the LEA deny Student Homebound services on or about April 30, 2024? If so, was the denial inappropriate because the parent was not in attendance when an IEP dated February 19, 2024 was drafted which excluded homebase/homebound services?  Did the LEA deny Student a FAPE?

**ISSUE 7:**      Did the LEA deny Student access to a school sponsored band field trip to Kings Dominion on or about May 4, 2024, which included a recital? If so, did the LEA deny the student access to participate with her nondisabled peers?  Was there a denial of FAPE?

**ISSUE 8:**      Is the proposed/drafted IEP of February 19, 2024 inappropriate for the following reasons?

> **8(i).**    the IEP fails to address deficits in Student's reading. Specifically the deficits in reading are:    Student is 12-year-old 6th grader whose fluency, reading comprehension, and vocabulary are at least three (3) grade levels below her current grade;
>
> **8(ii).**   the IEP fails to address Student's absences/attendance as a functional skill, but instead, subjects the student to the state compulsory attendance laws. (4/8/24 DPC;
>
> **8(iv.)**  IEP meeting was held on or about February 19, 2024, without the parent being present and with the parent receiving less than a 48-hour notice of the meeting's scheduling.  Further during the meeting, the decision was made that Student must return to school in-person.

**ISSUE 9.**      Did Student experience any anxiety, trauma, and or attendance issues during the 2023-2024 school year?  If so, was the LEA required to conduct a functional behavior assessment (FBA) prior to developing the February 19, 2024 IEP?  If so, and an FBA was not conducted, did the LEA deny Student a FAPE?

**ISSUE 10.**      Did the LEA discontinue Student's virtual counseling with her private therapist during the school day as of on or about January 12, 2024, replace that counseling with an unqualified counselor, identified as a CSA counselor by Parent?  If so, has there been a denial of FAPE?

**ISSUE 11.**      Did the LEA refer Student to the Attendance Officer and disenroll Student on or about February 28, 2024, rather than referring any attendance issue of Student to the IEP team?  If so, has the LEA discriminated against Student?  Should the LEA have provided a prior written notice (PWN) before any disenrollment of Student on or about February 28, 2024?  Has Student been denied FAPE if there was discrimination and/or no PWN provided?

**ISSUE 12.**      Whether the LEA has retaliated against the parent for speaking out at the February and March 2024 School Board meetings by since the date of the February 2024

school board meeting (i) causing Parent to be charged with truancy of Student, (ii) reportedly not accepting medical excuses of Student, (iii) causing the arrest of Parent's advocate, and (iv) not making provisions for homebased/homebound services?  If so, has the student been denied a FAPE?

**ISSUE 13.**    Did the LEA deny the parent meaningful participation?  If so, has there been a denial of FAPE?  Specifically,

> **13(i)**   Did the LEA deny Parent meaningful participation by  sending a CSA consent form to Parent to sign?
>
> **13(ii)**   Did the LEA deny Parent meaningful participation by predetermining the need for additional evaluations?
>
> **13(iii)**  Did the LEA deny Parent meaningful participation during an IEP meeting held on February 19, 2024, by (i) convening the meeting without the parent, Student, and Parent's advocate?
>
> **13(iv)**  Did the LEA fail to acknowledge and include Student's medical excuses from February 2024 to May 2024 in Student's IEP and educational record? If so, did the LEA deny meaningful participation?
>
> **13(v)**   Were decisions about Student's education or provision of services made outside an IEP meeting and to the exclusion of Parent?  If so, was Parent denied meaningful participation?

**ISSUE 14:**    Is compensatory education due?  Specifically is private, group, individual, and grief counseling due; nursing services, recreational therapy, and a safety plan.

If parent is requesting compensatory services listed here, during the hearing Parent is expected to provide evidence on why the proposed services are appropriate, the frequency and duration of the services requested, and when the services should be provided.

**ISSUE 15:**    Was the resolution meeting held on May 16, 2024, procedurally flawed because
- disinterested school employees were included as members of the resolution team; particularly, Stefani Rivere, Kevin Socha, Katie Wojcicki, and Katie Matheny;
- Student's case manager was not included as a member of the resolution team; and
- Parent was denied meaningful participation by the inclusion of Rivere, Socha, Wojcicki, and Matheny as resolution team members.

Did any procedural flaw of the resolution meeting constitute a denial of FAPE?

## III.    BURDEN OF PROOF

The United States Supreme Court held in *Shaffer v. Weast*, 546 U.S. 49, 126 S. Ct. 528, 163 L. Ed.2d 387 (2005), that the party seeking relief bears the burden of proof. Therefore, in this case the parent bears the burden of proof as she is challenging the LEA's actions.

## IV.    STATEMENT OF FACTS

1      Student is 12 years of age.   At the beginning of the 2023-24 school year Student was enrolled as a sixth grader at Middle School.  (Tr. 2 at 119).

2.      The LEA had determined prior to Student's 6th grade school year that Student was eligible for special education and related services under the categories of OHI due to Student's ADHD and SLD.  LEA determined Student had a learning disability in the area of basic reading, reading fluency, reading comprehension, written expression, and math calculations.  (Tr. 3 at 11; LEA Exh. 3 at 1).

3.      Around August 29, 2023, school staff became aware that Student's mother had become ill and was hospitalized.  As the hospitalization continued, Student visited her mother and starting accruing absences from school.  (Tr. 3 at 15-16).

4.      Student lost her mother on September 23, 2023. (Tr. 1 at 85).

5.      Student missed additional time to attend her mother's out of state funeral which occurred on or about October 6, 2023.  Some administrators of the LEA and staff attended the Student's Mother's wake.  (Tr. 1 at 241; Tr. 2 at 120-21).

6.      By early October, Student had accrued 10 absences.  Some were noted as excused others were not.  Per LEA policy once a student accrues 10 absences, regardless of excused or unexcused status, a letter is sent to the parent regarding the Student's attendance.  This district policy applies to all students whether eligible for special education or not.  (Tr. 2 at 120-24).

7.      Student's attendance was also affected by Parent dropping Student off to school late, often as late as 45 minutes after school started, or picking Student up from school at least an hour before the end of the school day.  The late drop offs and early departures from school caused Student to miss more than minimal instruction time.  (Tr. 2 at 124-25).

8.      Vice Principal (VP) is in charge of attendance for sixth graders at Middle School. Hence VP monitored sixth graders' attendance. Accordingly, per school policy, after Student had accumulated at least the 10 absences referenced above, VP sent Parent a letter in October, 2023, asking to meet with Parent and set up an attendance plan.  At the time of the letter VP noted that Student had accumulated at least 11 unexcused absences.  The letter is dated October 5, 2023.  (Tr. 2 at 120-24; P Exh. 6 at 7).

9.      Parent did not respond to VP's letter requesting an attendance plan meeting.  (Tr. 2 at 120-24).

10.     Student's mother was also Parent's significant other or wife.  After Student's mother's passing, Parent would arrive at Middle School two to three times  a week without an appointment.  Parent would engage in conversations with Guidance counselor, Principal, or VP.  Conversations typically could last from 45 minutes to 2 hours.  Often Parent would have had staff bring Student to the office to be signed out of school early.  Hence Student would often be in the office while Parent was engaging in the conversations with school staff. Topics Parent talked about often were not about Student or not strictly about Student, but rather, Parent's financial predicament, a car accident, foreclosure on his home, his mother-in-law and custody of his children, and community resources that he could contact to provide him and has family assistance.  This scenario resulted in Student missing substantial instructional time in her classes while Parent was conversing with school staff.  (Tr. 1 at 241-42, 293-94; 293-94; Tr. 2 at 126-131).

11.     Parent had several meetings with Director of Student Services and Intervention (Dir. of SSI) during the first semester of the 2023-24 school year.  During those meetings, Parent expressed several concerns.  After one such meeting which occurred in November 2023, Dir. of SSI followed up by sending Parent a letter dated December 14, 2024.   (Tr. 2 at 134; LEA Exh. 9)

12.     Dir. of SSI was familiar with Student from working with the family when Student attended Elementary School.      In addition to addressing parental concerns that Parent had mentioned during their meetings, the December 14 letter addressed Parent visiting Middle School unannounced and staying extended periods of time and other matters such as Student's virtual counseling.  (Tr. 2 at 131-34; LEA Exh. 9)/

13.     Among other topics, the letter addressed parent's claim that Student's sister had been bullied by another girl at school.  Claims had been investigated and there was no finding of bullying.  The December 14, 2023 letter did indicate claims of bullying had been investigated and measures had been taken to resolve conflicts.  Student's sister also had a trusted adult she could go to.

        By VP's testimony which the Hearing Officer found credible, VP had not been informed of any bullying claim concerning Student.  Also, the school's counseling logs did not indicate Student had reported bulling to her trusted adult or school-counselor.  Despite not being informed that Student had been bullied at school, the school provided resources. The school provided a school counselor for Student to use for conflict resolution and a trusted adult that Student could turn to if a problem like bullying appeared.  Sister was also provided a trusted adult like Student.  Moreover 6 to 8 weeks of school-counseling was offered for Student and her sister to assist the student and her sister in developing conflict resolution.

        Per Parent's testimony, he could not recall whether he signed the form providing consent for school-based counseling.  Also, Parent believed the school-counselors were not adequately trained.

        The evidence does not establish Parent provided consent for school-counseling.

(Tr. 2 at 136-37; Tr. 1 at 300; LEA Exh. 9).

14.    The December 14 letter also addressed Student's virtual counseling. Because Student had lost her mother,  LEA allowed Student to have virtual counseling at school with her private therapist through January 11, 2024. The school had never made this accommodation before, but because Student had recently lost her mother, the VP showed her "grace" and allowed the counseling. The virtual counseling was not provided for on Student's IEP.

The coordination so that the counseling could occur was done by the school. For the counseling to take place, a school staffer would have to set it up. At times the counselor would change the time of the session after staff had set it up. Setting up the arrangement took 15-20 minutes of a staff person's time. Student's counseling sessions would sometimes occur during instructional time. As such, Student would miss educational instruction. Because of these concerns, the school ended the virtual counseling as of January 12, 2024. Student was offered school-based counseling for 6 to 8 weeks. Consent, however was required from the parent. Parent did not provide consent. Moreover, the school did provide for a trusted adult for Student, a school counselor that student liked.  Parent was provided a month's notice that the virtual counseling would be cancelled.

(Tr. 2 at 141-48; Tr. 1 at 300-02; LEA Exh. 9).

Regarding whether Parent provided consent for the school-based counseling, by Parent's testimony, he did not believe the counselor had adequate training. Further, Parent testified that he signed the consent form but was not able to provide documentation to substantiate his statement. (LEA 9; Tr. 1 at 238, 298-301). (Tr. 2 at 138-39).

Hearing Officer finds the evidence insufficient to show Parent provided consent for the school-based counseling offered in the fall of 2023.  Having made this finding, Hearing Officer cognizant of the parent's claim that although counseling was offered, it was not available at the time. (Tr. 1 at 300).

The private therapy was not provided for in Student's IEP. (Tr. 1 at 302).

15.    The December 14 letter also set forth the policy for visiting Middle School. Policy did not ban Parent from school. Policy asked Parent to limit his conversation with his daughters to five minutes if circumstances require him to come to the school to speak with one of his daughters. Moreover, the policy noted that if Parent has arranged to pick up his daughters early, they are required to stay in class until his arrival and the front office staff will call to the classroom upon his arrival.  Moreover, the policy stated that if Parent brings his daughters to school after the bell rings |tardy|, Parent is requested to sign them in and allow them to go directly to class. The Policy also informed Parent that he could visit school when he had an appointment, to drop off or pick up his children, or for other events where families are invited. Once events are over, Parent was to timely leave the school grounds. The Policy noted that visitors are only allowed in the building or parking area for specific purposes; that is, parent has an appointment, to drop off/pick up child, or event families are invited to. Moreover, the letter noted that if a visitor, including a parent, is not on school premises for

a specific purpose, the individual would be deemed trespassing.

The December 14 letter also addressed Parent's concerns about Student's history grade.
(Tr. 2 at 150-51; LEA Exh. 9).

## Meetings Set for Annual Review of IEP and Annual Review

16.     Also, on December 14, 2023, an annual review IEP team meeting had been scheduled. This was the case because Student's annual IEP review was due by January 3, 2024.  (Tr. 3 at 19)

What led to the Student's case manager scheduling the IEP annual review meeting for December 14, 2023, is the sequence of events noted here.  On November 13, 2023, Student's case manager sent an email to Parent attempting to get his input on a date and time the IEP team and parent could meet to develop Student's annual IEP.  The email provided available dates and times.  Parent did not respond.  As a result the case manager sent parent another email on November 16, 2023, about coming up with a date to schedule the IEP to conduct the annual review of Student's IEP.  Case Manager had suggested some dates in her email.  Parent did not respond to either of the emails.  (Tr. 3 at 21-24).

17.     After receiving no response from Parent, the LEA scheduled an IEP meeting for December 14, 2023; the LEA sent notice of the meeting to parent.  Parent did not send back to LEA the second page of the notice indicating whether he would attend.  Another notice was sent to parent of the meeting on December 7, 2024.   (LEA Exhs. 5-6; Tr. 3 at 25-26).

18.     The scheduled December 14, 2024 IEP meeting did not occur because Parent contacted the school's administrator the night before and stated he could not attend.  No reason was given by Parent for indicating he could not attend.  On December 14, 2024, Lead Teacher spoke with parent by phone and rescheduled the meeting for January 3, 2024.  A meeting notice for the rescheduled meeting was sent to parent Tr. 3 at 27-29; LEA Exh. 8)

19.     The school-based members of the IEP team held the scheduled meeting on January 3, 2024.  Parent did not attend.  The morning of the meeting, Parent emailed the principal. Upon contacting the principal, Parent informed the principal for the first time that he would not make the meeting..  Communications with the Parent regarding the annual IEP meeting had been with the case manager and/or Lead Teacher.  Moreover, normally, Parent would communicate with the lead teacher, not the principal.  The LEA proceeded with the IEP meeting on January 3, 2024, because the annual review was due on that day.  Also, Parent had received several notices, emails, and phone communication about the meeting.  In addition, the school had sent Parent several drafts of the IEP.  (Tr. 1 at 325; Tr. 3 at 40-43).

20.     Parent did not give a reason why he could not participate in the IEP meetings that had been scheduled for on December 14, 2023, and January 3, 2024.  (Tr. 3 at 44)

21.     During the IEP team meeting held on January 3, 2024, the members of the IEP team present developed an IEP.     Those in attendance were Lead Teacher, Case Manager, Administrator designee and, General Education Teacher. (Tr. 3 at 44-45).

22.     By email on January 3, 2024, Parent was informed that on January 3, 2024, a proposed IEP was developed and if he desired changes, the IEP team could meet later during the week or the next week to go over the IEP and make any adjustments necessary. By email, Case Manager provided Parent a copy of the IEP on January 4, 2024.  Case Manager also offered to meet with Parent in person or on the phone to go over the proposed IEP, or to make amendments.  Parent did not respond to Case Manager or Lead Teacher.   (Tr. 3 at 47-49; LEA Exhs. 11 and 12).

23.     By email on January 5, 2024, Lead Teacher followed up asking Parent if he desired to meet to go over the IEP and also offering to stay back to help Student with her missed History assignments. Lead Teacher also followed up with a telephone call on January 25, 2024, and an email of same date. On January 25, 2024,  Parent was also provided a copy of the May 15, 2023 IEP and the IEP developed on January 3, 2024. On January 25, 2024, Lead Teacher also offered Parent the opportunity to schedule another IEP meeting at an agreeable time.  Parent did not respond (Tr. 3 at 51-57; LEA Exhs. 13, 15).

        Parent did not give a reason for not being able to attend the scheduled IEP meetings nor did he respond to LEA's multiple requests to provide his available to attend or to collaborate with LEA to set a date for the IEP meetings.  (Tr. 3 at 40-61;LEA Exhs. 5 – 13, 15, 19).

## Attendance Plan And Safety Plan Meetings February 5, 2024

24.     Student's absences continued to accrue after the winter-break. By January 18, 2024, Student had accumulated 20 absences and 15 tardies.  (LEA Exh. 14).

25.     The school showed the Student grace with her attendance from fall 2023 to January 2024 due to Student's mother being ill and passing.  During this time, Student had tardies, early dismissals, late arrivals, and absences. For absences marked unexcused they could be changed to excused after notification of an approved reason for the absence, such as a note from a doctor, bereavement, etc., is received  (Tr. 2 at 240-241).

26.     After affording the Parent/Student a grace period, VP sent Parent a letter dated January 18, 2024, regarding the student's absences. In that letter, VP informed Parent that they needed to meet to develop an attendance plan for Student. Parent did not respond to this correspondence.  VP also saw Parent at the school at the end of January, 2024, and confirmed Parent received the January 18, 2024 letter and reminded Parent that they needed to sit down and form an attendance plan. VP followed up his in-person contact with parent with an email sent on January 31, 2024, scheduling an attendance plan meeting for February 5, 2024.  Principal sent Parent a link for the meeting to be held on February 5, 2024.  (Tr. 1 at 233; Tr. 2 at 154-56; LEA Exhs. 14, 17 and 18).

27.     The attendance meeting convened as scheduled on February 5, 2024. Those present were VP, Parent's Advocate, Parent, Student's school counsel, 7th grade counselor. The meeting's purpose (to draft an attendance plan) was not accomplished due to Parent and parent's advocate not allowing others to speak. Parent and parent's advocate spoke on topics other than the attendance. No attendance plan could be developed so the LEA ended the meeting after about an hour. (Tr. 2 at 162).

28.     A safety plan meeting was also held on February 5, 2024. It was held virtually. Present were VP, Student's private counselor, Parent, Student, 6th grade school counselor. VP introduced himself at the beginning of the meeting without event occurring. During the meeting there was a discussion about Student's diagnoses and medications. Private Counselor had to redirect Advocate and Parent. The meeting continued for an hour. Per testimony of VP, Advocate and parent again monopolized the meeting. The meeting was not able to progress. Hence a safety plan was not developed during the meeting. (Tr. 2 at 165).

        After an hour, the meeting ended.

        Correspondence from Private counselor indicates the counselor inadvertently ended the meeting after an hour. (P Exh. 3).

        By Parent's testimony, the meeting ended because the VP was causing Parent to have a panic attack. (Tr. 1 at 194-96).

        The Hearing Officer finds the evidence is not sufficient to show VP caused Student to have a panic attack.

29.     Despite the meetings ending without developing safety and attendance plans, the LEA moved forward with drafting both plans. (Tr. 2 at 166).

30.     VP sent a letter and the draft attendance plan on February 21, 2024, to Parent and requested his feedback. None was received. (Tr. 2 at 166-67 LEA Exh. 26).

31.     The attendance plan was not implemented because Student did not return to school after February 5, 2024. (Tr. 2 at 170).

32.     Lead Teacher did not attend the safety plan and attendance meetings. However, it was communicated to Lead Teacher by at least one person in attendance at those meetings that during the safety plan/attendance plan meeting, Parent's Advocate requested an IEP meeting. Hence by email dated February 6, 2024, Lead Teacher reached out to Parent again attempting to schedule an IEP meeting. Several meeting dates and times were given for scheduling the IEP meeting. The latest date offered was February 19, 2024. The February 6, 2024 correspondence informed parent, of among other matters, that if Lead Teacher did not hear back from Parent regarding his availability to meet, the IEP meeting would be held on February 19, 2024 at 1:00 p.m. Parent did not respond to the letter. (LEA Exh. 19; Tr. 3 at 58-59).

## February 19, 2024 IEP Meeting

32.     Lead Teacher sent Parent notice of the scheduled February 19, 2024 meeting by email on February 14, 2024. The notice indicated that concerns about school-based counseling and homebased instruction would be addressed at the meeting. The notice was sent to Parent's email address. Parent did not respond. Parent did not attend the February 19, 2024 IEP meeting. (LEA Exh. 21; Tr. 3 at 59-63)

33.     The LEA held the meeting on February 19, 2024. Parent did not attend and had not informed the school that he could not attend. Those in attendance were Lead Teacher, general education teacher, special education teacher, administrator (VP), and school psychologist. (Tr. 3 at 64; LEA Exh. 22).

        School Psychologist attended the February 19, 2024 IEP meeting because there were concerns regarding Student about anxiety, panic attacks, grief, and attendance. These concerns were discussed during the IEP meeting. (Tr. 4 at  20, 80).

34.     The meeting resulted in a proposed IEP. The IEP did not provide for an FBA. (LEA Exh. 22).

35.     Those present during the February 19, 2024 meeting reviewed various data. Specifically, reviewed were previous IEPs, progress reports, previous educational and psychological tests, eligibility documents, teacher input, and parental input that had been provided to the school prior to the meeting as Parent did not attend the IEP meeting.

        Those present during the meeting also considered the concerns raised at the safety plan and attendance plan meetings. Additionally addressed were the requests for counseling services and home- based services. Student's educational record and her grades were reviewed.   The administrator present at the meeting mentioned that a diagnosis of adjustment disorder had been mentioned at the safety plan meeting. However at the time that the February 19, 2024 meeting was held, the school had not received for consideration any documentation or the report of a diagnosis of adjustment disorder. Accordingly, no such documentation was reviewed.

(Tr. 3 at 65-66)

        Student had previously been found eligible for special education as a student with a SLD in the areas of reading, writing, and math. Additionally, Student was deemed eligible under OHI due to ADHD. Per testimony of Lead Teacher, adjustment disorder is not related to those disabilities. (Tr. 3 at 67).

### Goals, Accommodations, and Services

#### The IEP developed Goals addressing Student's SLD

36.     Areas of weakness for Student in reading were reading fluency and decoding.  The

proposed IEP set forth seven (7) measurable goals.

The IEP's first goal specifically addressed reading fluency; the second goal addressed decoding.  Goals 1 and 2 specifically state the following:

> **Goal 1:**    Given an instructional level passage, [Student] will use taught strategies to improve her reading fluency by reading text at 85 words per minute with at least 90%accuracy in 2 out of 3 opportunities by 2/19/2025.

> **Goal 2:**    Given instruction on word analysis and decoding strategies and a list of non-contextualized words (including current and previously taught syllable types and sound patterns) [Student will use learned strategies to accurately decode words with at least 80% accuracy in 75% of opportunities observed by 2/19/2025.

Goals 3 and 4 of the IEP addressed student's writing.  Goal 7 addressed areas of weakness in math.  Those goals stated the following:

> **Goal 3:**    Given instruction, a writing prompt, access to word prediction software, an editing checklist, and no more than 2 teacher prompt, [Student] will edit and revise her writing for clarity (i.e. complete/correct thoughts, correct word choice) and sentence fluency (complete sentences with correct capitalization, and punctuation) with at least 70% accuracy (as measured by score earned on a writing rubric) in at least 75% of opportunities observed by 2/19/25.

> **Goal 4:**        Given a writing prompt, a graphic organizer, access to assistive technology, and an editing checklist, [Student] will compose an organized, on topic, response with a clear introduction, including a topic sentence or thesis statement, at (sic) least 3 relevant supporting details with appropriate elaboration, transition words, and a conclusion with at least 80% accuracy (as measured by score earned on a writing rubric) in at least 75% opportunities observed by 2/19/25.

> **Goal 7:**    Given a multi-step, grade level word problem [Student] will identify the correct calculations required to solve the problem and correctly solve the problem by performing the operations with 80% accuracy in 4 out of 5 trials by 2/19/25.

(Tr. 3 at 67-69; LEA Exh. 22 at 11-14 and 17).

37.    Goals 5 and 6 were designed to address Student's OHI because of her ADHD. Goal five addressed attention and organization. Goal six addressed organization.. These goals were designed to address student's unique needs in these areas. They were appropriate. (Tr. 3 at 76; LEA Exh. 22 at 15-16). Specifically, the goals provide the following:

>    Goal 5:              Given instruction, teacher directions, and/or an agenda/task list [Student] will display on task behaviors and remain attentive during class (i.e. participating in discussions, following along with notes, actively working on assignment, beginning and completing/submitting assignments, etc.) with no more than 2 prompts on at least 80% of observable opportunities by 2/19/25,

>    Goal 6:              Given instruction [Student] will utilize an organizational system for her classes as evidenced by such things as locating needed papers for class, utilizing homework/take-home folder as needed, having necessary materials in class (such as Chromebook), utilizing school websites for information, and /or turning in assignments with no mor than 2 prompts in 80% of opportunities observed by 2/19/25.

(Tr. 3 at 75-76; LEA Exh. 22 at 15-16).

The present members of the IEP team developed the goals to meet the unique needs of Student in the areas of SLD and OHI (ADHD). (Tr. 3 at 69, 76).

38.    The proposed IEP also provided for accommodations and services to assist Student in reaching her goals. (LEA Exh. 22 at 18-23).

39.    Regarding goals 1, 2, 3, 4, and 7 which addressed Student's SLD, the IEP provided several accommodations. They included (i) audio assessments due to Student's low reading level; (ii) text to speech and Snap and Read to assist Student in writing; (iii) access to touch screen, Chromebook, and Co-Writer to assist Student with her writing; (iv)closed notes. (LEA Exh. 22 at 18-19).

40.    Services regarding goals 1,2,3,4, and 7, which addressed Student's SLD, included collaborative English, Science, and mathematics to provide support for Student based on her SLD. By the classes being collaborative, Student would have access to the special education teacher and specifically designed instruction and general education teacher in the class with her peers. Also , Student had the service of a self-contained reading intervention class to address Student's specific reading  needs because Student is significantly behind in reading. (Tr. 3 at  73 - 75; LEA Exh. 22 at 23).

41.    Regarding goals 5 and 6 which addressed Student's OHI, accommodations included small group settings to minimize distractions. Additionally, the accommodation of closed

notes was provided to help the student maintain attention, among other things. The IEP also provided the accommodation of frequent check ins.  (Tr. 3 at 75-78; LEA Exh. 22 at 18-19).

42.     Also, the IEP proposed services to help student meet her goals 5 and 6 which addressed Student's OHI needs.  Executive functioning was proposed to help Student with organization, self-awareness and her attention.  (Tr. 3 At 78; LEA Exh. 22 at 23 ).

### Concerns of parent – Homebased Services and Counseling

43.     Team discussed home-based services and whether home-based instruction was appropriate at the time.  The team determined that assisting student with her needs due to her two disability categories, SLD and OHI related to ADHD could best be met in a public day school, not home-based instruction.  Accordingly, members of the IEP team who met on February 19, 2024, determined Student's LRE was public day school. (Tr. 3 at 83; LEA Exh. 22 at 24).

44.     The team members present discussed counseling services, the circumstances Student had been experiencing.  School psychologist was greatly involved in the discussion and the IEP provided for 120 minutes of counseling per month, to include counseling on calming and coping strategies.  (Tr. 3 at 79-80).  As written, there was flexibility in the amount of counseling Student could receive a week.  For example, if Student needed 45 minutes of counseling one week and 15 another, the flexibility provided for in the IEP allowed such. (LEA Exh. 22 at 23).   Counseling would be provided by the school psychologist and entail calming strategies, coping skills, and cognitive behavior techniques.  The counseling services would be in addition to Student having access to the school counselors.  (Tr. 4 at 32-34, 77). School Psychologist had conferred with or obtained information from Student's school counselor prior to the IEP meeting and was informed of the coping strategies that Student was using and their effectiveness.

        The services would have entailed first determining what strategies Student was currently using and whether they worked or not.  Then additional coping skills, calming strategies, and general cognitive behavior techniques would be explored.

        Per present members of the IEP team, counseling services were designed for eight (8) weeks because the goal was to teach Student a skill or skills she lacked  and normally those skills could be taught in 8 weeks.  However, the plan was to reevaluate Student at the end of the 8 weeks to determine if more counseling was needed.

        The counseling services were to be provided in conjunction with the school safety plan.  Also, student would have had access to the school counselor.
(Tr. 4 at 32-35).
45.     As noted, School Psychologist was greatly involved in the discussion regarding Student's need for counseling.  Among other data reviewed, School Psychologist reviewed Student's prior evaluations from her educational records, her IEP and a draft safety plan. School Psychologist noted in her review that Student's disability categories were OHI due to an attention disorder and SLD.  School Psychologist also noted that in the draft safety plan

it was noted that student's private therapist had diagnosed Student with adjustment disorder with mixed anxiety and depressed mood.

Per School Psychologist testimony, the school noted the private therapist's diagnoses on the draft safety plan which resulted from the February 5, 2024 Safety plan.

Per School Psychologist's testimony, having a diagnoses of adjustment disorder with mixed anxiety and depressed mood, does not necessarily equate to an emotion disability. The reason is the adjustment disorder is not sufficient for determining eligibility in school. Second, an adjustment disorder as defined by the DSM-5 is that the symptoms do not persists for over 6 months. With an emotional disability the symptoms must persist for over a year.

By expert testimony of School Psychologist, having a diagnoses of adjustment disorder with mixed anxiety and depressed mood does not mean a student has met the criteria for a mental health disability like anxiety. This is the case because the DSM-5 states that for an adjustment disorder, the individual does not meet the criteria for another mental health disorder.    For the same reason, having a diagnoses of adjustment disorder with mixed anxiety and depressed mood does not mean a student has met the criteria for a mental health disability like depression.

(Tr. 4 at  22-23, 27).

School Psychologist also reviewed school counselor's notes and became aware that after student's Mother's death, Student had 3 panic attacks.  School Psychologist also reviewed the proposed safety plan and in her opinion found the safety plan appropriate because it had different levels of support. The first step was using calming strategies and taking a break; the second step involved Student having access to a counselor and if necessary her medication. In addition, the plan could be modified if it was needed. (Tr. 4 at 28-31; LEA Exh. 27).

46.     Student did not return to school after Feb. 5, 2024, thus, there was no opportunity to observe her and implement the psychological counseling.  (Tr. 4 at 38).

## Reevaluation

47.     During the IEP team meeting on February 19, 2024, the present members of the IEP team discussed re-evaluating Student.  Specifically, the team discussed the safety plan, current mental health concerns of Student, and panic attacks.  Team then determined there was a need to re-evaluate Student to determine if Student continued to have a disability, if she had a disability in another category in light of new adjustment disorder that did not relate to her current disability categories, and if additional special education and related services were needed.

Because it was determined that re-evaluation was appropriated, present members of the team determined student needed educational assessment, psychological assessment, and

social and cultural assessments, and observations. There was no determination that any behavior of Student impeded her learning or others. The team did not determine an FBA was appropriate.

Team members present sent the parent PWN regarding the proposal for the reevaluation. Team members present requested Parent's consent to obtain the evaluations proposed. Parent did not give consent.

School Psychologist, in her expert opinion, testified those evaluations were appropriate to collect the necessary data on Student to decide about Student's disability categories and to determine her need for special education and related services..

School Psychologist also opined that the proposed IEP was appropriate to address Student's social and emotional needs.
(Tr. 4 at 28, 37-38, 70-73; LEA Exhs. 22 at 4; 23; and 24)

48.    Lead Teacher opined in her expert opinion that based on the information before the team as of the February 19, 2024 meeting, the proposed IEP was appropriate to address Student's specific needs related to OHI or ADHD and SLD and that the IEP proposed would ensure that Student would make appropriate progress in light of her circumstances (Tr. 3 at 83-84).

49.    The PWN for the proposed IEP has "draft" stamped on it because the Proposed IEP remained a draft until Parent was able to meet about the IEP.  (LEA Exh. 25; Tr. 3 at 88-89).

50.    The February 19, 2024 IEP was not identical to Student's prior IEP. For example, the proposed February 19, 2024 IEP increased Student's time in self-contained reading. Moreover, the time allotted for collaborative English was increased. (Tr. 3 at 98-104).

51.    By her testimony, School Psychologist was aware that Student experienced three panic attacks while she was in school; however, many days Student was in school she did not have a panic attack. Further, there was no determination that any behavior of Student impeded her learning or others. (Tr. 4 at 70-73; LEA Exh. 22 at 4). Moreover, Student's first quarter grades were As and Bs, except in history. Student had an F in her advanced history class. Second Quarter grades were not noted on the proposed IEP, presumably because Student had been absent from school. (LEA 22 at 7).

52.    The present members of the IEP team did not find an FBA was required. The evidence is insufficient to show that at the time of the February 19, 2024 meeting, LEA had access to medical records from the private therapist and Pediatrician. Evidence does show that the homebound medical certification form was not returned by Pediatrician until February 28, 2024, 9 days after the IEP was developed. (P Exh. 2 at 3).

53.    Lead Teacher opined in her expert opinion that based on the information before the team as of the February 19, 2024 meeting, the proposed IEP was appropriate to address

Student's specific needs related to OHI or ADHD and SLD and that the IEP proposed would ensure that Student would make appropriate progress in light of her circumstances (Tr. 3 at 83-84).

54.     Moreover, School Psychologist qualified as an expert in school psychologist. School Psychologist opined that the IEP was appropriate to address Student's social and emotional needs. (Tr. 4 at 37, 93)

55.     Hearing Officer found Lead Teacher and School Psychologist credible and has given deference to their opinions.

## OTHER

56.     Lead Teacher holds an undergraduate and master's degrees in special education. She has taken classes that specialize in reading and in literacy and is trained in Wilson reading Program and in Orton-Gillingham. Lead Teacher has served as a special education teacher for 9 years. Also, she has served as a case manager. She currently serves as an instructional coach and the Lead Teacher supervising special education teachers at Middle School. Lead Teacher has participated in hundreds of IEP meetings and at least 150 eligibility teams. She has managed at least 100 students with disabilities in categories of SLD and OHI. She has experience developing IEPs. Lead Teacher conducts educational testing, writes the related reports, and chairs the eligibility team meetings. She also writes the Prior Written Notices. (Tr. 3 at 257- 262).

57.     Lead Teacher qualified as an expert in reading instruction, IEP development, and special education. (Tr. 2 at 271).

58.     The Hearing Officer found Lead Teacher a credible witness and has given great weight to her testimony.

59.      Vice Principal has been an educator for 21 years.   He has worked as a general education and special education teacher.   He holds a master's degree in educational leadership. As part of his duties as the 6th grade administrator he assists in developing school safety plans and attendance plans. Also, he oversees attendance for students in grades 6 through 8 at the Middle School. He has previously qualified as an expert in school administration and safety in due process hearings. (Tr. 2 at 108- 09).

60.     Vice Principal qualified as an expert in school safety and in school administration. (Tr. 2 at 119).

61.     The Hearing Officer found Vice Principal a credible witness and has given great weight to his testimony.

62.     School Psychologist has been a school psychologist with the LEA for 30 years. She holds a master's degree in school psychology and a certificate of advanced study in school psychology. She is licensed in school psychology through the VDOE. In her role as a school

psychologist, School Psychologist conducts psychological evaluations (about 1800 during her career), participates in eligibility meetings (about 2000 in her career). The majority of students she has evaluated have SLD or OHI. School Psychologist also provides counseling to students with and without IEPs. She attends about 20 IEP meetings a year and participates in the development of the IEP. Mainly, her participation is in the area of social/emotional behavioral concerns. School Psychologist has never seen a safety plan be incorporated into the IEP. School Psychologist has developed about 25 safety plans over her career. School Psychologist has conducted about five FBAs a year over the last few years of her career. (Tr. 4 at 12-14)

63.     School Psychologist qualified as an expert in IEP development and in school psychology. (Tr. 4 at 18.)

64.     School Psychologist opined that an FBA was not necessary. (Tr. 4 at 70).

65.     The Hearing Officer found the school psychologist persuasive.

65.     Safety plans are not usually provided in IEPs. (Tr. 4 at 12-14).

66.     The Hearing Officer did not find Parent fully persuasive.

67.     The evidence is insufficient to show that LEA accepted the medical excuses of other students as excused and failed to accept Student's medical excuses as excused.

68.     By testimony of Lead Teacher, which the Hearing Officer finds credible, On August 29, 2023, Student's teachers, Lead Teacher, and Parent met to discuss Student.     Parent expressed words to the effect of "if [those meeting with him that day] [blew smoke up his behind area][4], then they were dead to him. Thereafter, Case Manager was not comfortable communicating with Parent.

As a result because Lead Teacher had worked with the family and Student in the past, Lead Teacher was often the one communicating with Parent.     If Case Manager communicated with Parent, Lead Teacher was copied on the communication.

(Tr. 3 at 22-23).

69.     The Hearing Officer considered the testimony of Student and Sister and gave it the weight the Hearing Officer deemed appropriate.

70.     Hearing Officer found the testimony of Student Services Assistant Director credible.

71.     Under 8 VAC 20-110-130(3), a student absent for 15 consecutive days or more must be dropped from the roll and marked as "withdrawn." This regulation does not make exceptions for a student with a disability. *See* 8 VAC 20-110-130.

---

[4] Lead Teacher indicated that Parent used a curse word referencing his "behind area." (Tr. 3 at 23).

72.     Evidence shows that a safety plan and attendance plan were drafted outside an IEP meeting.  Also, the homebound application was denied outside the IEP meeting.

Parent was sent copies of drafted attendance and safety plans.  (LEA Exhs. 26-27).

73.     Family Friend has known  family since October 2023.  An organization he is a member of provided resources to Parent and his family: wood, food, finances.  (Tr. 2 at 36).

74.     Family Friend visited Middle School on April 8, 2024.  He was there first to pick-up Student because she was not enrolled as a student at the time.  Family Friend then took Student to her home and returned with Parent so Parent could reenroll Student.  Student did not want to go inside the school and remained in the car while Family Friend and Parent went inside to reenroll Student.  Per Family Friend's testimony, he did not observe the school offering supports to Parent or Student during Family Friend's visits to the school.  (Tr. 2 at 60).

75.     Family Friend was not aware whether the school had offered school counseling and psychological counseling.  Family Friend was not aware Parent had declined counseling offered by the school.  (Testimony of Family Friend).

76.     Hearing Officer has considered the testimony of Family Friend and gives it limited weight.

77.     Pastor qualified as an expert in PTSD and safety planning (Tr. 1 at 148).

78.     Pastor is not licensed as a psychologist or a social worker.  He has not created a safety plan to be implemented in a school setting.  He had not reviewed Student's medical records. (Tr. 1 at 141-43

79.     Pastor met the family about April 2024.  (Tr. 1 at 160).

80.     By Pastor's testimony, when concerns about Student's safety was made to school, school only said they were investigating.  Per Pastor's testimony, the school failed to respond to concerns about student's safety  (Tr. 1 at 155-57).

81.     Pastor was not aware that school proposed a safety plan for Student.  (Tr. 1 at 181).

82.     Hearing Officer has considered the pastor's testimony and gives limited weight to it.

## ATTENDANCE, REFERRAL, AND HOMEBOUND APPLICATION

83.     Returning to the attendance plan, the attendance plan was not implemented because Student did not return to school after February 5, 2024.  (Tr. 2 at 170).

84.     A draft of the attendance plan was sent to Parent on February 21, 2024, with an accompanying letter.   The plan was still being developed.  (LEA Exh. 26, Tr. 2 at 249)

85. Because Student was approaching 15 consecutive days of absences, and VP had not received feedback from Parent regarding the attendance plan, VP sent a follow up letter on February 26, 2024. VP also resent the attendance plan with the letter. Letter informed Parent that if child has 15 consecutive absences she could be disenrolled. Moreover, letter noted a CHINS petition would be filed by LEA. (LEA Exh. 27; Tr. 2 at 171).

86. Parent also did not provide feedback for the safety plan so the school proceeded to draft one. Strategies included deep breathing to address anxiety. (Tr. 2 at 174).

87. VP then made referral to attendance officer regarding student's attendance. (Tr. 2 at 177).

88. Student Services' Assist. Director is the LEA's attendance officer. Her responsibilities include receiving referrals regarding students who may have attendance issues and filing Chins petitions with the Juvenile and Domestic Relations District Court when a student has excessive absences. In addition, the Student Services' Assist. Dir. receives and reviews homebound requests including the medical certification of needs form and other forms related to the request for homebound services. (Tr. 3 at 225-226).

89. Student Services' Assist. Director received VP's referral (was informed about Student's chronic absences) regarding Student as she had missed school 15 consecutive days as of late February 2024. (Tr. 3 at 226).

90. Under 8 VAC 20-110-130(3), a student absent for 15 consecutive days or more must be dropped from the roll and marked as "withdrawn." This regulation does not make exceptions for a student with a disability. *See* 8 VAC 20-110-130.

Upon receiving the referral, Student Services' Assist. Dir. reached out to Parent to discuss Student's attendance by telephone and by written communication. (LEA 28, 3 Tr. at 228-29). Parent did not respond. (Tr. 3 at 230).

91. On February 28, 2024, LEA received a homebound instruction medical certification of need form from Student's Pediatrician. The form was dated February 12, 2024. The physician's office apologized for sending the form late; that is February 28, 2024. (Tr. 3 at 230- 233; P Exh. 2 at 3; LEA Exh. 20).

92. The form was not complete or had deficiencies.

For one, the form did not indicate if the student was confined to the home.

In addition, the parent had not completed the second page of the form which would have provided consent for the LEA to communicate with Pediatrician. The release is a requirement under VDOE guidance documents.

Further, Pediatrician noted on the form that the student could not attend school if

accommodations are made.  Student Services Assist Dir. was unsure if Pediatrician was aware of the supports offered by the school and she was unable to communicate with Pediatrician to inform him of the supports offered  because the parent had not provided consent to do so.
(Tr. 3. At 233-237; LEA Exhs. 20 and 50).

93.     To be eligible for homebound instruction, question 5 on the form must be answered. (Tr. 3 at 234).

94.     On February 28, 2024, Student Services Assist Dir. sent an email to Parent with the release portion of the form attempting to get a release from him. There was no response from the parent so Student Services Assist Dir. followed up asking for the release again by email on February 29, 2024, and informing Parent that the student had been unenrolled due to the 15 consecutive absences.  Student Services Assist Dir. also informed Parent that for the homebound instruction  to be considered, Student would have to be reenrolled.  Parent did not respond.  (Tr. 3 at 237-40; LEA Exhs. 29-30).

95.     Student Services Assist. Dir. followed up with Parent by sending Parent a letter on March 1, 2024.  In that letter, Student Services Assist Dir. informed parent that if she did not hear back from parent she would need to move forward with a Child in Need of Services Petition (CHINs Petition).  In addition, Student Services Assist. Dir. sent Parent an email on March 4, 2024 requesting again that Parent provide a release.  (Tr. 3 at 241-42; LEA Exhs. 32-33).

96.     On March 11, 2024, Student Services Assist Dir. received the release from the parent. Student Services Assist Dir. then tried to contact Pediatrician on March 12, 2024.  His office informed Student Services Assist Dir.  that Pediatrician was out of the office until March 20. Student Services Assist Dir.  informed Parent of her efforts by email sent on March 12, 2024. (LEA Exhs. 34 and 35, Tr. 3 at 245-46).   Parent had only authorized communication in writing with the Pediatrician's office.  (Tr. 3 at 244).

97.     Student Services Assist Dir. informed parent that student had to be enrolled for the homebound paperwork to be processed and for Student to be eligible for homebound instruction.  (Tr. 3 at 246-47; LEA Exhs. 50 and 36).

98.     By letter dated March 14, 2024, Student Services Assist Dir. informed Parent of the reasons the homebound paperwork could not be fully processed.  Those concerns were that:

> (1) question number 5 on the certification form which asks if Student is confined to the home was not answered, and
>
> (2) the pediatrician responded on the certification form that the "school has not been able to provide a safe and supportive environment for Student, nor shown support for her anxiety attacks"

Regarding the latter concern, the March 14, 2024 letter communicated to Parent that the LEA had made multiple attempts to work with the parent and Student's private provider to develop a safety plan and address Parent's concerns; however, Parent had not provided

feedback. The March 14, 2024 letter continued noting that the LEA was ready to provide an appropriate safety plan and to address Student's anxiety concerns. The March 14, 2024 letter went on to say that Student Services Assistant Dir had reached out to Student's pediatrician , but was told by his office that he was out of the office until March 20. Student Services Assist Dir. noted that upon his return she planned to reach out to the doctor for clarification. Then she would review the request for homebound instruction again.

Student Services Assist Dir. also informed Parent that he could address the concerns noted in her letter and resubmit the request for homebound instruction from a different provider. If so, Student Services Assist Dir would review the re-submitted request sooner. (LEA Exh. 36).

99.     Parent did not respond to the March 14, 2024 letter. (Tr. 3 at 250).

100.    By letter dated March 22, 2024, Dir. of SSI informed Parent of the same concerns Student Services Assist Dir had and why the homebound request could not be fully processed at the time. (LEA 37. Tr. 3 at 250-51).

101.    On March 21, 2024, Student Services Assist Dir contacted Pediatrician's office to speak to him about his response on the homebound request form. She was unable to speak to him because Parent had instructed the doctor's office to only communicate in writing.

102.    State of Virginia has compulsory attendance laws. (LEA Exhs. 47 and 48) LEA complied with its duties under the law/policy. (LEA Exh. 47 at 3-4).

103.    A Chins petition was filed by Student Services Assist Dir on March 6, 2024 for several reasons: Student had 36 absences for the school year. Student had been disenrolled. Parent had not reenrolled Student. Student Services Assist Dir was not able to talk to Pediatrician. LEA had had made numerous attempts to meet with Parent regarding Student's attendance and was unsuccessful. Moreover, the homebound paperwork was incomplete. (Tr. 3 at 253-54, 266-70, 295/17-18, 304-05).

104.    Student Services Assist Dir is the LEA's attendance officer and part of her job is to file a Chins petition when necessary. (Tr 3 at 254-55).

105.    As part of the Chins petition, Court ordered Parent to reenroll Student by March 29, 2024. (Tr. 3 at 255).

106.    On March 28, 2024, Student Services Assist Dir sent another email to Parent informing Parent of how he could reenroll the student. Student Services Assist Dir also sent again the homebound paperwork and guidance from VDOE. (LEA Exh. 38 and 50; Tr. 3 at 256-57). Parent did not reenrolled Student until April 8, 2024. (LEA Exh. 38 and 50; Tr. 3 at 256-57).

107. Pediatrician had sent a letter dated April 9, 2024, indicating that the estimated date for Student to return to school was April 12, 2024. On April 17, 2024, Student Services Assist Dir sent the father an email asking that Parent have Pediatrician update the estimated return date. Student Services Assist Dir stated in her April 17, 2024 letter to Parent that as soon as she received the completed homebound Instruction Medical Certification form, she would review the request for homebound instruction. Pediatrician updated the expected date of return and provided the form to the school on April 19, 2024. However, the homebound paperwork was still not complete because no answer to question number 5 was given on the form. (LEA Exhs. 40-41; Tr. 3 at 256-59).

Accordingly, Student Services Assist Dir contacted the doctor's office to obtain an answer to question number 5.

108. VDOE guidance document on homebound instruction states that homebound services should not be approved for periods in excess of nine calendar weeks. (Tr. 3 at 260).

109. On or about April 20, 2024, Pediatrician's office answered the question to number 5 indicating that the student was not confined to home.

Per the guidelines and LEA's policy, because the doctor indicated that the student was not confined to home, Student Services Assist Dir denied the request for homebound services. Student Services Assist Dir then notified the parent of the decision.

(Tr. 3 at 261-62; LEA Exh. 43).

## V.    LEGAL ANALYSIS

Congress passed the Individuals with Disabilities Education Improvement Act (IDEA/Act) to guarantee that children with disabilities have available to them a Free Appropriated Public Education (FAPE). 20 U.S.C. § 1400 *et, seq.* For this purpose, the federal government provides funds to states in exchange for the states' compliance with a set of regulations aimed at providing "special education and related services designed to meet" disabled children's "unique needs and prepare them for further education, employment, and independent living." *Id.* The IDEA anticipates cooperation between the schools and parents to best identify and serve the needs of disabled children. *See id.* §1400(d)(1B), (d)(3); *Schaffer v. Weast,* 546 U.S. 49, 53 (2005). (identifying that the "core of the statute" as "the cooperative process that it establishes between parents and schools").

Parent claims in this consolidated due process matter that the LEA has violated the IDEA and denied the student a FAPE. Below, the Hearing Officer sets forth her analysis, decision, and order.

ISSUE 1:    Did the assistant principal send the parent an attendance letter on or about May 2, 2024? If so, was this action taken by the LEA a unilateral one and did the action circumvent holding an IEP meeting and addressing Student's attendance? If so, was there

a denial of FAPE?

Parent contends that the VP sent Parent an attendance letter on or about May 2, 2024; the action was a unilateral one to circumvent an IEP meeting being held to address Student's attendance. Thus, there was a denial of FAPE.

The IDEA defines FAPE as special education and related services that:

> a. Are provided at public expense, under public supervision and direction, and without charge;
> b. Meet the standards of the state educational agency, including the requirements of this part;
> c. Include an appropriate preschool, elementary school, or secondary school education in the state involved; and
> d. Are provided in conformity with an individualized education program that meets the requirements of 34 C.F.R. §300.320 through 300.324.

The Special Education Hearing Officers assigned to hearing due process hearings have jurisdiction to adjudicate IDEA claims related to the identification, evaluation, or placement of a student with a disability or the provision of a FAPE to a child with a disability. *See* C.F.R. §300.121; §§300.507-518; see also, 8 VAC 20-81-210(A)(1)-(4).

That said, the evidence does show VP is the administrator in charge of 6th grade attendance at Middle School and that Student during the 2023-24 school year was a 6th grader. Further, evidence shows that as a LEA policy, when a student has missed at least 10 days during a school year, the employee in charge of attendance at a school, in this case VP, sends a letter to the parent asking for an attendance meeting to develop an attendance plan. The evidence demonstrates that such a letter is unrelated to the evaluation, identification, or placement of a student with a disability or the provision of a FAPE to a child with a disability. This is the case because all students whether eligible for special education and related services or not are subject to VP sending an attendance letter of this kind when a student has been absent from school for 10 or more days.

Moreover, the Hearing Officer notes that the evidence does show that Student never attended school after February 5, 2024. Consequently, the LEA unenrolled Student on February 28, 2024, after Student was absent from school for 15 consecutive days. Parent then reenrolled Student on April 8, 2024. At that time, Student had not been approved for homebound instruction. Assuming VP sent Parent an attendance letter on May 2, 2024, presumably any letter sent was because after Student's reenrollment on April 8, 2024, by May 2, 2024, Student had missed at least 10 school days. As mentioned, per LEA policy, the administrator in charge of 6th grade attendance at the school sent the letter, as he would to any student in such a situation, requesting an attendance meeting to develop an attendance plan, for early intervention. The Hearing Officer finds the claim is not an IDEA one and she has no jurisdiction to decide the issue.

Moreover, the Hearing Officer notes that Parent provided little to no evidence on any

alleged May 2, 2024 attendance letter sent to Student.  Parent has the burden of proof and has not met it.

**ISSUE 2.**      Did the LEA deny Student FAPE due to disability harassment based on attendance from January, 2024 to present?  Particularly, (i) did the LEA accept other sixth grade students' medical excuses to excuse their absences while not accepting Student's medical excuses and deeming her absences unexcused and (ii) did the LEA propose attendance meetings rather than scheduling IEP meetings to address Student's absences?

Parent contends that the school subjected Student to disability harassment from January 2024, to present.  Specifically, Parent claims that the LEA accepted other sixth grade student's medical excuses to excuse their absences while not accepting Student's medical excuses and deeming her absences unexcused.  Also, Parent asserted that the school engaged in disability harassment against Student when it proposed an attendance meeting rather than scheduling IEP meetings to address Student's absences.

Disability harassment that adversely affects a student's education may be a denial of FAPE if it decreases the student's ability to benefit from her education. *See* 111 LRP 45106 (2000).

Parent failed to provide evidence to support that other sixth grade students' absences were excused when they presented medical documentation, but Student's was not when medical documentation was presented on her behalf.  What the evidence shows is that at times initially an absence may be noted as unexcused until sufficient documentation or information is provided to show the absence is excused.

Moreover, as previously discussed the VP requesting to set up an attendance meeting after a student has accumulated at least 10 absences is not harassment but simply the LEA following a policy that all students are subject to should they accumulate at least 10 absences within a school year.  All students were subject to this same policy.

The Parent has failed to state an IDEA claim.  This special education Hearing Officer does not have authority to adjudicate the claim.

## HOMEBOUND SERVICES ISSUES

**ISSUE 3:**      Did the LEA note student's absences from school on October 6, 2023, and on or about February 1, 2024 to present as unexcused?  Should the LEA have identified Student's absences on October 6, 2023, and on or about February 1, 2024, to present as excused and provided for homebased instruction/homebound services during those times? If not, has the LEA deprived the student of an educational benefit and denied FAPE?

**and**

**ISSUE 5:**      Did the LEA provide for homebased instruction or homebound services for the student on her IEP or an amendment to the IEP for a period beginning on or about

January 2024 to present?   If not, did the LEA wrongfully deny homebase instruction/homebased services?  If so, has the student been denied a FAPE?

and

ISSUE 6.     Did the LEA deny Student Homebound services on or about April 30, 2024? If so, was the denial inappropriate because the parent was not in attendance when an IEP dated February 19, 2024 was drafted which excluded homebase/homebound services?  Did the LEA deny Student a FAPE?

In consolidating issues 3, 5, and 6, the Hearing Officer finds Parent alleges that the LEA's failure to approve homebound services for Student was a denial of FAPE.  Parent asserts that the LEA failed to note Student's absences from school on October 6, 2023, and February 1, 2024, to present as excused.  Moreover, Since the absences were excused, the LEA should have provided homebound services during those dates or amended the student's IEP with a provision for homebound instructional services.  Parent argues that the denial of the homebound services' application in late April, 2024, was wrong, and Student has been denied a FAPE.

Per the testimony of VP who is in charge of attendance for 6th graders at Middle School, a student's absence from school may initially be deemed unexcused until sufficient information or documentation is provided by the parent or guardian that a legitimate reason existed for the absence, such as, but not limited to a doctor's appointment, illness, attending a funeral, etc.  The absence then could be changed to excused.

The Hearing Officer found VP's testimony credible.

Regarding a student receiving homebound instructional services, for a student to meet the criteria for a homebound instruction program, the student must be confined at home or in a health care facility for periods that would prevent normal school attendance based upon certification of need by a licensed physician, physician assistant, advanced practice registered nurse, or clinical psychologist.  *See*  8 VAC 20-131-110; LEA Policy Manual, Section 1 Instruction; Off-Site Instruction and Virtual Courses.  If homebased services are necessary, approval of those services are based upon the completion of a medical certification of need.  *See* VDOE Homebound Instructional Services Guidelines at 7 (providing "if homebased services are needed, approval of services is based on a medical certification of need).

For students eligible for special education or related services, the Individualized Education Program (IEP) committee must revise the IEP, as appropriate, if homebound services are needed.  8 VAC 20-131-110.  This means that even if an application for homebound services is approved, the IEP team, not a therapist or physician determines if homebased services will be a provided for in the student's IEP.

The evidence shows that Student's absence in the fall of 2023, and second semester of the school year may have initially been noted as unexcused.  Upon the school receiving

information that there was a legitimate reason for the absences, the attendance report was amended to show the majority of Student's absences were excused. The evidence is not clear on when documentation was received to cause the LEA to amend an unexcused absence to an excused one.

The evidence also shows that the school did not receive the information it needed from Pediatrician to fully process Parent's application for homebound instructional services in the most-timely fashion. Moreover, the parent's actions or non-action made it more difficult for the LEA to receive the information needed to process the application.

Specifically, on February 28, 2024, Attendance Officer received a homebound instruction medical certification of need form from Pediatrician. Although the form was dated February 12, 2024, the pediatrician's office acknowledged and apologized for not sending the homebound medical certification form to school until February 28, 2024. Parent testified that the Pediatrician provided the form to the school on February 12, 2024. This testimony was refuted by other credible evidence of record. The Hearing Officer finds that although the form was dated February 12, 2024, it was provided to the school on February 28, 2024.

Once received, the evidence shows the form was incomplete and had deficits. For one, question 5 on the form had not been completed. This item asks the one completing the form if the student is confined to home. To be eligible for homebound services, item 5 must be answered on the form. In addition, the parent had not completed the second page of the form which would have provided consent for the LEA to communicate with Pediatrician. The release is a requirement under VDOE guidance document. Furthermore, on the form received from Pediatrician, the pediatrician noted that student could not attend school if accommodations are made. Student Services Assist Dir. was unsure if Pediatrician was aware of the supports offered by the school and she was unable to communicate with Pediatrician to inform him of the supports offered  because the parent had not provided consent to do so.

Because the LEA did not have the parent's consent or a signed release, on February 28, 2024, Student Services Assist Dir. sent an email to Parent with the release portion of the form attempting to get a release from him. There was no response from the parent so Student Services Assist Dir. followed up asking for the release again by email on February 29, 2024, and informing Parent that the student had been unenrolled  due to the 15 consecutive absences.   Student Services Assist Dir. also informed Parent that for the homebound instruction to be considered, Student would have to be reenrolled. Parent did not respond.

Student Services Assist Dir. (Attendance Officer) followed up with a letter sent to Parent on March 1, 2024. In that letter, Student Services Assist Dir. again informed Parent that she required the parental release.  Moreover, Parent was informed that if Student Services Assist Dir. did not receive a response from Parent, she would need to move forward with a Child in Need of Services Petition (CHINs Petition). In addition, Student Services Assist. Dir. sent an email on March 4 again requesting a release from Parent.

On March 11, 2024, Student Services Assist Dir. received the release from the parent. Student Services Assist Dir. then tried to contact Pediatrician on March 12, 2024. His office informed Student Services Assist Dir. by letter that Pediatrician was out until March 20. Parent had authorized only written communication between the LEA and Pediatrician's office. The Hearing Officer finds that this single mode of communication likely hampered processing the homebound services application.    Student Services Assist Dir. informed Parent of her efforts by email sent on March 12, 2024.

In communicating with Parent and updating him regarding the status of processing Parent's request for homebound services, Student Services Assist Dir. informed parent that student had to be enrolled to be eligible for homebound services and for the homebound paperwork to be processed.

By letter dated March 14, 2024, Student Services Assist Dir. informed Parent of the reasons the homebound paperwork could not be fully processed. Those reasons were the following:

- Question number 5 on the certification form which asks if Student is confined to the home was not answered

- Additionally, the physician responded on the certification form that the "school has not been able to provide a safe and supportive environment for Student, nor shown support for her anxiety attacks."

Regarding the latter concern, the March 14, 2024 letter communicated to Parent that the LEA had made multiple attempts to work with the parent and Student's private provider to develop a safety plan and address Parent's concerns; however, Parent had not provided feedback. The March 14, 2024 letter continued noting that the LEA was ready to provide an appropriate safety plan and to address Student's anxiety concerns.  The March 14, 2024 letter went on to say that Student Services Assistant Dir had reached out to Student's pediatrician , but was told by his office that he was out of the office until March 20. Student Services Assist Dir. noted that upon his return she planned to reach out to the doctor to get clarification. Then she would review the request for homebound instruction again.  Student Services Assist Dir. also informed Parent that he could address the concerns noted in her letter and resubmit the request for homebound instruction from a different provider.  If so, Student Services Assist Dir would review the re-submitted request sooner.

Parent did not respond to the March 14, 2024 letter.

On March 21, 2024, Student Services Assist Dir contacted Pediatrician's office to speak to him about his response on the homebound request form.  She was unable to speak to him because Parent had instructed the doctor's office to only communicate in writing.

On March 22, 2024, Dir. of SSI  wrote to Parent again about continued concerns

regarding Student's absences, the homebound application and its incompleteness and why it could not be fully processed, the proposed safety plan and attendance plan, Student's withdrawal from school due to 15 consecutive absences, and the proposed IEP dated February 19, 2024.

On March 28, 2024, Student Services Assist Dir sent another email to Parent informing Parent of how he could reenroll the student. Student Services Assist Dir also resent the homebound paperwork and guidance information from VDOE. Parent did not reenrolled Student until April 8, 2024.

On April 9, 2024, Pediatrician sent a letter of same date indicating that the estimated date for Student to return was April 12, 2024. On April 17, 2024, Student Services Assist Dir. sent Parent an email asking Parent to have Pediatrician update the estimated return date as VDOE's guidance on homebound services indicates that such services should not be approved in excess of nine (9) calendar weeks. Student Services Assist Dir stated in her April 17, 2024 letter to Parent that as soon as she received the completed homebound Instruction Medical Certification form, she would review the request for homebound instruction. Pediatrician updated the expected date of return and provided this update to school on April 19, 2024. However, the homebound paperwork was still not complete because no answer was provided to the form's question 5 regarding whether the student was confined to home.

Because as of the date April 19, 2024, Pediatrician had not answered the question regarding whether Student is confined to home, Student Services Assist Dir contacted the doctor's office to obtain this information. On or about April 20, 2024, Pediatrician answered the question. Specifically, Pediatrician stated the student was not confined to home. Per the guidelines and LEA's policy, because the doctor indicated that the student was not confined to home, Student Services Assist Dir denied the application requesting certification for homebound services. Student Services Assistant Dir. then notified Parent of the decision.

Hearing Officer also notes that the IEP team held an IEP meeting on February 19, 2024. Parent was notified of the meeting, but did not attend. Prior to scheduling the meeting for February 19, 2024, the LEA had provided parent with other available dates that the meeting could be held. Parent did not respond. (LEA Exhs. 19 and 21). During the February 19, 2024 IEP meeting homebound services were discussed by the team members present. Parent was sent a copy of the proposed IEP, but did not consent to it or provide feed-back, or request amendments.

Considering the evidence above, the Hearing Officer finds the parent is unable to show the LEA wrongly denied Parent's request for homebound services.

**ISSUEs 4 and 12.** Did the LEA retaliate against the student from January 15, 2024, to present? Specifically were the following acts retaliation: limiting parent to five minutes on school property to communicate an emergency to Student; disregarding instructions of

medical providers of Student; not providing for a case manager for Student; causing criminal charges for truancy to be lodged against Parent; drafting an IEP without parental input and input from Student's doctor and therapist; not providing a PWN?

and

<u>ISSUE 12</u>.      Whether the LEA has retaliated against the parent for speaking out at the February and March 2024 School Board meetings since the date of the February 2024 school board meeting by (i) causing Parent to be charged with truancy of Student, (ii) reportedly not accepting medical excuses of Student, (iii) causing the arrest of Parent's advocate, and (iv) not making provisions for homebased/homebound services?  If so, has the student been denied a FAPE?

The Parent contends that LEA retaliated against Student from January 15, 2024, to present.  Parent alleges those acts of retaliation were (i) limiting parent to five minutes on school property to communicate an emergency to Student; (ii) disregarding instructions of medical providers of Student; (iii) failing to provide a case manager for Student; (iv) causing criminal charges for truancy to be lodged against Parent; (v) drafting an IEP without parental input from Student's doctor and private therapist; and (vi) failing to provide a PWN.

Also, Parent asserts the LEA retaliated against him by causing him to be charged with truancy, not accepting medical excuses of Student, causing arrest of Parent's advocate, and not providing homebound services.

Several jurisdictions have found that a retaliation claim under the IDEA may be made.  *See e.g.*,  75 IDELR 75 (D.N.M. 2019).

OCR and courts typically use a multistep analysis under which a complainant has the burden of establishing the following four elements of the claim:

1.  The complainant engaged in a protected activity.
2.  The complainant suffered an adverse action around the same time (contemporaneously or within a reasonable amount of time after the protected activity).
3.  The district was aware of the complainant's protected activity.
4.  There is evidence of a causal connection (nexus) between the protected activity and the adverse action.

Once the complainant meets the burden of proof for a retaliation claim, OCR then considers:

5.  Whether the recipient has identified a legitimate, nondiscriminatory reason for taking the adverse action; and, if so,
6.  Whether the reason asserted is a pretext for discrimination.

*See Olathe (KS) Unified Sch. Dist. #233,* ,47 IDELR 78 *(OCR 2006) See also Camfield v. Board of Trs. of Redondo Beach Unified Sch. Dist.,* 70 IDELR 126 *(C.D. Cal. 2017), aff'd,* 75 IDELR 59 *(9th Cir. 2019, unpublished)* (finding that the district could restrict a parent's access to her child's elementary school after she disapproved of the child's classroom assignment, raised her voice, used profanity, and appeared on campus without appointments); *Cleburne County (AL) Sch. Dist.,* 68 IDELR 146 *(*OCR 2016) (finding that the district offered a legitimate, non-pretextual explanation to refute retaliation claim.

During her testimony, Student stated that she spoke out at school board meetings and after that "things starting going down-hill." Specifically, Student stated that the parents of some other students would not allow their children to hang out with Student anymore. Nothing in the record indicates that the LEA influenced the other parents' and students' responses to Student voicing her opinion at the school board meetings.

Parent alleges another example of retaliation is that the school's limiting him to five (5) minutes at school to communicate an emergency to Student. As to this allegation of retaliation, the evidence shows that a letter dated December 14, 2023, was sent to Parent by the Dir. of SSI. The director had worked with the family when Student was in elementary school and had met with Parent several times during the 2023-24 school year at the time the letter was sent to Parent. The letter addressed matters parent had talked with the director about. Among other topics, the letter addressed Parent visiting Middle School and the administrative office building. In pertinent part, the letter stated "if circumstances require you to come to the school to speak with one of your daughters, please limit these conversations to 5 minutes. If it exceeds this time, it will be necessary to either sign them out or continue the conversation at home."

The evidence shows that two to three times a week, Parent would arrive at school unannounced. He would have Student taken out of class and brought to the office. Often during this time, Parent was engaging in conversations with VP or other staff. Sometimes the conversation was about Student and her sister. Other times the conversations were about his finances, losing his house or car, a car accident, a custody matter with Parent's mother-in-law, etc. The conversations could last from 45 minutes to two hours. During this time Student was missing a substantial amount of instructional time just sitting in the office while Parent was talking. Further, staff was unexpectedly spending substantial time with Parent. While the letter from the director requests that parent limit his conversations with Student to 5 minutes, the letter does not mention the word "emergency." Moreover, Parent had the option of signing the student out or continuing the conversation later at home. In addition, as referenced Parent was visiting the school as frequently as 2 to 3 times a week and unannounced. The Hearing Officer notes that emergencies by their nature do not normally occur on such a regular basis.

The Hearing Officer cannot find that the school's December 14, 2024 letter to Parent was retaliation due to a protected activity of Parent.

Parent also asserts that the LEA retaliated against Parent/Student by not providing a case manager. To the contrary, the evidence shows the Student had been assigned a case manager. By way of example, the case manager attended and provided input at the February

19, 2024 IEP meeting. The case manager met with the Parent along with Student's other teachers at the beginning of the school year. Moreover, the case manager communicated with Parent attempting to schedule the IEP meeting regarding the annual review.

The evidence also shows that the case manager did have some discomfort reaching out to Parent due to a reported statement he made to the case manager at the beginning of the school year to the effect of "if you blow smoke up my *expletive*, you are dead." Hearing Officer finds a reasonable person could interpret Parent's reported comment as a threat to do harm to the individual the statement was directed toward (in this case the case manager) if Parent does not agree with what case manager has said or done regarding Student.

Parent additionally claims retaliation because LEA disregarded instructions of medical providers, denied homebound services application, caused Chins petition to be filed, held IEP meeting without parental input and input from Student's private therapist and pediatrician.

Evidence as a whole fails to support the parent's claims.   LEA considered Pediatrician's certification form for homebound services and after doing so denied the application for reasons already stated. Evidence shows that medical notes or excuses from Pediatrician were received after the February 19, 2024 IEP meeting and after drafting the attendance and safety plans.

Moreover, the evidence shows that the LEA filed a Chins petition because, despite multiple efforts by the LEA to intervene early on and thereafter regarding Student's attendance, Parent was nonresponsive or failed to work with the school. As early as October 2024, VP sent letter to Parent regarding the Student's attendance. An attempt was made to schedule an attendance meeting early in the school year. The attendance plan meeting was eventually set for February 5, 2024. It convened, but after about an hour, the meeting was terminated due to actions of Parent and the advocate. The LEA then formulated a plan and by letter dated February 21, 2024, sent the draft plan to the parent. Feedback was requested, but the parent provided none.   VP then sent an email marked "urgent" to Parent on February 26, 2024. VP requested a meeting with Parent to address Student's attendance. The email also mentioned that if Student reached 15 consecutive days of absence, she would be withdrawn from school and a Chins petition filed.   Parent was nonresponsive. Subsequently, VP referred the matter to the attendance officer, Student Services Assistant Director.

On February 27, 2024, by email, the Student Services' Assistant Dir. reached out to parent regarding Student's attendance and informed Parent that Student had 15 consecutive absences and would be withdrawn. *See*  22.1-258 of the Code of Virginia. Student Services' Assistant Dir. also requested a meeting. Moreover, Under 8 VAC 20-110-130(3), a student absent for 15 consecutive days or more must be dropped from the roll and marked as "withdrawn." This regulation does not make exceptions for a student with a disability. *See* 8 VAC 20-110-130.

Because on February 27, 2024, Student had accumulated 15 consecutive days of absences, LEA disenrolled Student.

By March 6, 2024, Student had been absent 36 times during the school year and had been unenrolled in school as of February 28, 2024. Student Services Assist. Dir. then filed a Chins petition.

The evidence shows that at the time the Chins petition was filed, the LEA did not have documentation showing Student had a mental illness.

Considering the totality of the evidence, the Hearing Officer cannot find LEA filed the Chins petition to retaliate against the parent.

For reasons already noted, HO finds the denial of the homebound services application was not retaliation.

## Prior Written Notice

Providing a parent with a prior written notice (PWN) is a procedural safeguard under the IDEA. A PWN must be sent at "a reasonable time" before the LEA proposes or refuses to initiate or change the identification, evaluation, educational placement, or the provision of FAPE. 34 C.F.R. §300.503(a); 8 vac20-81-170(C).

Parent argues that before Student was withdrawn by the LEA, the LEA should have provided the Parent with a PWN.

Student was disenrolled due to VDOE regulation not related to the IDEA. *See* 8 VAC 20-110-130(3), a student absent for 15 consecutive days or more must be dropped from the roll and marked as "withdrawn." This regulation does not make exceptions for a student with a disability. *See* 8 VAC 20-110-130. It does not pertain to IDEA. No PWN is required.

## Development of IEP in Absence of Parent, Etc.

Regarding the claim that the IEP was developed without input from Parent. Evidence shows Parent got sufficient notice of IEP meetings and did not attend. Further, Parent provided no reason for not attending. Team that assembled considered information provided by the private therapist. At the time no diagnosis had been provided by Pediatrician.

In sum, Parent has failed to show retaliation against Student/Parent.

**ISSUE 7:** Did the LEA deny Student access to a school sponsored band field trip to Kings Dominion on or about May 4, 2024, which included a recital? If so, did the LEA deny the student access to participate with her nondisabled peers? Was there a denial of FAPE?

The Parent contends Student was denied FAPE because she was not allowed to attend a field trip with her peers.

LEA policy is that if a student has been withdrawn or unenrolled from school, that student is not permitted to attend a field trip with other enrolled students.

Under 8 VAC 20-110-130(3), a student absent for 15 consecutive days or more must be dropped from the roll and marked as "withdrawn." This regulation does not make exceptions for a student with a disability. *See* 8 VAC 20-110-130.

By Student's testimony, she was not allowed to participate in the field trip because she had been withdrawn from school. Parent did not reenroll Student in time for her to participate in the field trip. This situation has nothing to do with the evaluation, placement, eligibility, or the provision of FAPE. Instead it is about school policy prohibiting any student not enrolled in school from participating in a school field trip.

Parent failed to demonstrate a valid IDEA claim.

**ISSUE 8:**     Is the proposed/drafted IEP of February 19, 2024 inappropriate for the following reasons?

8(i).     the IEP fails to address deficits in Student's reading. Specifically the deficits in reading are:     Student is 12-year-old 6th grader whose fluency, reading comprehension, and vocabulary are at least three (3) grade levels below her current grade;

8(ii).     the IEP fails to address Student's absences/attendance as a functional skill, but instead, subjects the student to the state compulsory attendance laws.

8(iii.)     IEP meeting was held on or about February 19, 2024, without the parent being present and with the parent receiving less than a 48-hour notice of the meeting's scheduling. Further during the meeting, the decision was made that Student must return to school in-person.

and

**ISSUE 9.**     Did Student experience any anxiety, trauma, and or attendance issues during the 2023-2024 school year? If so, was the LEA required to conduct a functional behavior assessment (FBA) prior to developing the February 19, 2024 IEP? If so, and an FBA was not conducted, did the LEA deny Student a FAPE? ?

First, the Hearing Officer considers issue 8; that is, Parent's claim that the proposed IEP developed on February 19, 2024, is inappropriate for several reasons: it does not address Student's reading deficits; it fails to address Student's attendance as a functional skill as the LEA subjects Student to compulsory attendance laws; it fails to place Student in a homebased setting; and the meeting developing the IEP was held in Parent's absence.[5]

---

[5] Hearing Officer determined Parent failed to provide sufficient notice and clarification of any other claims regarding the IEP dated February 19, 2024, being inappropriate. *See* Hearing Officer's order issued June 10, 2024, and incorporated here.

The IEP of a child with a disability must provide a program that is reasonably calculated to enable the student to make appropriate progress in light of the student's circumstances. *Endrew F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988 69 IDELR 174 (2017). *See also Bd. Of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 553 IDELR 656 (1982).

Further, school districts must be able to offer a "cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable Student to make progress appropriate in light of his/her circumstances. *Endrew F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988 69 IDELR 174 (2017).

### Parent Afforded the Opportunity to Participate

The evidence shows that the IEP meeting took place on Monday, February 19, 2024. Those present at the February 19, 2024 IEP meeting were VP as the administrator, Lead Teacher/LEA Representative, School Psychologist, general education teacher, and Student's case manager.

Parent did not attend the meeting. The evidence shows the LEA made efforts to have Parent participate in an IEP team meeting to provide his input and to develop Student's IEP. On January 25, 2024, Lead Teacher sent Parent an email, requesting the IEP team meet, to address, among other things, Parent's concerns and the IEP that had been developed and proposed during an IEP meeting held on January 3, 2024. The Lead Teacher indicated in her email that Tuesday, January 30, 2024, was available for the meeting and asked if the parent was available that day to meet. Parent indicated or had indicated his unavailability on Tuesday. Later on January 25, 2024, Lead Teacher sent another email asking Parent to provide his availability or work with the LEA to find an agreeable date to hold an IEP meeting.

Parent did not respond to the second January 25, 2024 email.

Thereafter, it was reported to Lead Teacher that during an attendance plan meeting with Parent on February 5, 2024, (Lead Teacher did not attend this meeting) Parent had asked for changes to Student's IEP and inquired about Student receiving homebased services. Lead Teacher reached out to Parent by email sent on February 6, 2024, about scheduling an IEP meeting and addressing the parent's concerns, to include homebased services and counseling. She indicated that due to the concerns Parent raised, it was necessary for the IEP team to meet. In that email, Lead Teacher provided three available dates and times for the meeting. Of the three dates, the last one was February 19, 2024, 1:00 to 2:00 p.m. Lead Teacher asked Parent in the email to provide his availability or work with the school to come up with an available date to meet. Lead Teacher informed Parent also that if she did not hear from Parent by February 19, 2024, the IEP meeting would be held on that date, commencing at 1:00 p.m. Parent did not respond.

Next, the evidence shows that the Lead Teacher scheduled the IEP meeting for

Monday, February 19, 2024, at 1:00 p.m. and sent notice by email to Parent on February 14, 2024. The evidence shows that the email address appearing on the February 19, 2024 email with the attached notice was Parent's email before February 19, 2024, on February 19, 2024, and remains Parent's email. (Testimony of Parent).

The Hearing Officer finds the LEA afforded Parent an opportunity to participate in the February 19, 2024 IEP meeting. Further, Parent received sufficient notice of the meeting.

Hearing Officer now returns to the IEP team meeting held on February 19, 2024. The team had access to various data. The team had access to Student's educational record. They reviewed student's previous IEPs, previous educational and psychological tests, eligibility documents, Student's grades. The team considered teacher input and parental input that had previously been provided by Parent as he did not attend the meeting. The administrator present at the meeting mentioned that adjustment disorder with mixed anxiety and depressed mood had been brought up at the safety plan meeting on February 5, 2024. The team considered that verbal report. No documentation on Adjustment Disorder was considered because the school had not received any. The team considered the student's disability categories and her areas of need. The team members present considered concerns raised at the safety and attendance meetings, to include homebased services and counseling for Student. They considered the things Student had been going through, for example the loss of her mother, grief, and panic attacks. The team discussed counseling services. School Psychologist was greatly involved in this conversation and the IEP developed provided 120 minutes of counseling per month, to include counseling on calming and coping strategies.

### Consideration of Homebound Services

Parent requested homebased services at the Attendance/Safety Plan meeting. His request was brought to the attention of Lead Teacher by the next day. The request was addressed during the February 19, 2024 IEP meeting. Regarding homebased services, the school had not yet received Pediatrician's homebound certification form as it was not sent to the school until February 28, 2024. That said, the team considered whether homebased services should be provided or Student's placement should be homebased. The team determined that assisting student with her needs due to SLD and OHI could best be met in a public day school. Hence, team determined that homebased instruction was not student's LRE.

### Attendance

The members of the IEP team present did not discuss the source of Student's absences because attendance was not related to the disability categories for which Student had been found eligible for special education. Those categories were OHI due to ADHD and SLD with deficits in reading, writing, and mathematics. The IEP team did however discuss supports for Student. Per Lead Teacher, an expert in IEP development and special education, Student's attendance was not a functional skill but a life skill because she was dependent on others to transport her to and from school.

Regarding Student's attendance, the evidence shows that early in the school year, the school attempted to meet with Parent to develop an attendance plan. Then on February 5, 2024, an attendance plan meeting was held, but the school terminated the meeting after about an hour, because Parent and Parent's advocate would not permit others to speak. Subsequently, the school developed an attendance plan, provided a copy to Parent. However, Parent did not provide feedback.

## Addressing Student's Deficits in Reading

The evidence shows the IEP team assembled on February 19, 2024, developed goals addressing Student's unique needs as they related to her identified disability categories.

The IEP team assembled drafted five measurable annual goals addressing Student's needs regarding SLD. Goal one addresses student's weakness in reading fluency. Goal two addresses decoding. The third goal addresses writing, particularly, editing and revising student's writing. Goal four is a writing goal as well addressing composition and written expression. Goal 7 addresses Student's need in math and focuses on math, multistep word problems, identifying the correct calculation , and completing the problem correctly.

The assembled members of the team also developed two annual measurable goals to address students OHI due to ADHD, goals 5 and 6. Goal five addresses attention and organization. Goal six addressed organization. These goals were designed to address student's unique needs in these areas. The evidence shows they were appropriate.

The evidence shows that the seven drafted goals were developed based on Student's class performance and educational testing.

The assembled IEP team also provided for accommodations related to the goals.

Accommodations addressing student's needs with regard to her SLD and providing access to the curriculum include access to audio for assignments given to Student on grade level, closed notes so Student can take notes appropriately, word banks and word prediction software to help Student with her written language.

The proposed IEP contained accommodations to address the OHI goals (5 and 6). Specifically, a small group setting was provided. This allowed Student to take assessments in a different classroom with fewer distractions. Another accommodation was closed notes. This latter accommodation would help Student with her spelling. In addition, it was designed to help Student pay attention. The frequent check-ins also is an accommodation to address her OHI.

The proposed IEP provided services.  Services included collaborative English, Science, and mathematics to provide support for Student based on her SLD. The evidence

demonstrated that by the classes being collaborative, Student would have access to the special education teacher and specifically designed instruction and general education teacher in the class with her peers. Also, the IEP provides the service of a self-contained reading intervention class to address Student's specific reading needs because Student is significantly behind in reading.

Also, the IEP proposed services to help student meet her goals 5 and 6 addressing her OHI. Executive functioning was proposed to help Student with organization, self-awareness and her attention.

The IEP also sets forth the frequency, location, setting, and duration of the accommodations and services.

### Reevaluation

Team discussed that during safety plan meeting it had been reported that student was experiencing panic attacks. Team determined it would be appropriate to get updated assessments to determine if Student had additional educational needs. So the team proposed a reevaluation. Team proposed obtaining educational, psychological and social cultural and classroom observations. Team sent Parent a PWN regarding the proposal for the reevaluation. Team members present requested Parent's consent to obtain the evaluations proposed. Parent did not give consent.

### FBA

Now the Hearing Officer considers Parent's issue 9, that is, whether the team should have considered an FBA

8 VAC20-81-160 provides in pertinent part

> In the event that the child's behavior impedes the child's learning or that of others, the IEP team shall consider the use of positive behavioral interventions, strategies, and supports to address the behavior. The IEP team shall consider either:
>
> a. Developing goals and services specific to the child's behavioral needs; or
>
> b. Conducting a functional behavioral assessment and determining the need for a behavioral intervention plan to address the child's behavioral needs.

8 VAC 20-81-160(A)(2)

Student's mother died in late September 2023. Student started having panic attacks after her mother's death. Student accrued many absences from September 2023 to Feb 27, 2024. Student was withdrawn on February 28, 2024, due to 15 days of consecutive absences.

The evidence shows that during the development of Student's proposed IEP on February 19, 2024, the members of the IEP team present considered Student's behavior, mental health concerns as reported verbally during the safety plan meeting on Feb. 5, and panic attacks and whether an FBA was required. School Psychologist noted that she was aware that Student experienced three panic attacks while she was in school; however, many days Student was in school she did not have a panic attack. There was no determination that any behavior of Student impeded her learning or others. Moreover, Student's first quarter grades were As and Bs, except in history where Student had an F in an advanced history class. Second Quarter grades were not noted on the proposed IEP, presumably because Student had been absent from school.

While the team did not find an FBA was required, team did provide for counseling services for 120 minutes a month. As written, there was flexibility in the amount of counseling Student could receive a week. For example, if Student needed 45 minutes of counseling one week and 15 another, the flexibility provided for in the IEP allowed such. Counseling would be provided by the school psychologist and entail calming strategies, coping skills, and cognitive behavior techniques. The counseling services would be in addition to Student having access to the school counselors. School Psychologist had conferred with or obtained information from Student's school counselor prior to the IEP meeting and was informed of the coping strategies that Student was using and their effectiveness.

The evidence shows that at time of the February 19, 2024 meeting, LEA did not have access to medical records from Student's therapist or Pediatrician. Pediatrician provided the homebound medical certification form on February 28, 2024, 9 days after the IEP was developed.

Lead Teacher opined in her expert opinion that based on the information before the team as of the February 19, 2024 meeting the proposed IEP was appropriate to address Student's specific needs related to OHI or ADHD and SLD and that the IEP proposed would ensure that Student would make appropriate progress in light of her circumstances. Moreover, School Psychologist qualified as an expert in school psychologist. School Psychologist opined that the IEP was appropriate to address Student's social and emotional needs. School Psychologist noted the services provided were appropriate.

Hearing Officer found Lead Teacher and School Psychologist credible and has given deference to their opinions.

In Endrew F., the Supreme Court of the United States confirmed that deference must be given to the professional judgments of educators. It held that a court or hearing officer is required to give deference to the opinions of school board witnesses who are professional educators "based on the application of expertise and the exercise of judgment by school authorities." Endrew F.; *see also* Rowley 458 U.S. at 206-208; M.M., 303 F.3d at 533.

Moreover, In *Hartmann v. Loudoun* County, the Court stated:

> Although section 1415(e)(2) provides district courts with authority to grant 'appropriate' relief based on a preponderance of the evidence, 20 U.S.C. 1415(e)(2), that section 'is by no means an invitation to courts to substitute their own notions of sound educational policy for those of the school authorities which they review.' (citations omitted)[.] [t]hese principles reflect the IDEA's recognition that federal courts cannot run local schools. Local educators deserve latitude in determining the individualized education program most appropriate for a disabled child. The IDEA does not deprive these educators of the right to apply their professional judgment. 118 F.3d 996, 1000-1001 (4 th Cir. 1997).

Hearing Officer finds evidence insufficient to find the IEP dated February 19, 2024, is inappropriate. Parent has not met his burden and shown IEP inappropriate and that an FBA is required.

**ISSUE 10.** Did the LEA discontinue Student's virtual counseling with her private therapist during the school day as of on or about January 12, 2024, replace that counseling with an unqualified counselor, identified as a CSA counselor by Parent? If so, has there been a denial of FAPE?

Virtual counseling by Student's private counselor was not a part of Student's IEP. LEA had permitted Student to have virtual counseling sessions with her private therapist from about September 2023, to January 2024, because Student's mother died in September, 2023. Parent had requested that the school permit the counseling. School, out of an act of kindness, permitted the virtual counseling. Virtual Counseling by a student's private counselor had never been allowed before. Permission to allow the therapy was rescinded, effective January 12, 2024. Parent received a month's notice of the rescission. LEA did offer Student school-based counseling. Parent's consent was required to allow the counseling. Parent did not give consent. Moreover, Student did have a trusted adult she could go to at school. That individual was a school counselor and Student liked the counselor.

Conclusion:

Parent failed to show the counseling was a provision of Student's IEP. Evidence insufficient to show an IDEA claim and a denial of FAPE.

**ISSUE 11.** Did the LEA refer Student to the Attendance Officer and disenroll Student on or about February 28, 2024, rather than referring any attendance issue of Student to the IEP team? If so, has the LEA discriminated against Student? Should the LEA have provided a prior written notice (PWN) before any disenrollment of Student on or about February 28, 2024? Has Student been denied FAPE if there was discrimination and/or no PWN provided?

Parent contends that the LEA disenrolled Student on February 28, 2024, in lieu of holding an IEP meeting about Student's place. Parent contends the disenrollment was

discrimination. Further, before any disenrollment, the LEA should have provided Parent with a PWN.

The case before this Hearing Officer is under the IDEA. A PWN is a procedural safeguard under the IDEA. Under IDEA the LEA must send a PWN at "a reasonable time" before the public agency proposes or refuses to initiate or change the identification, evaluation, educational placement, or the provision of FAPE. *See* 34 C.F.R. §300.503(a).

Accordingly, the issue is not properly before the Hearing Officer. In this case, the LEA is not proposing or refusing to initiate or change the identification, evaluation, educational placement, or the provision of FAPE.

Further, for the sake of argument, there is no discrimination because all students are treated the same under the applicable attendance policy which requires disenrollment of any student when that student has been absent from school for 15 consecutive days. *See* 8 VAC 20-110-130.

Parent has failed to show an IDEA claim within the jurisdiction of the Hearing Officer.

**ISSUE 13.**    Did the LEA deny the parent meaningful participation? If so, has there been a denial of FAPE? Specifically,

> 13(i)   Did the LEA deny Parent meaningful participation by sending a CSA consent form to Parent to sign?
>
> 13(ii)   Did the LEA deny Parent meaningful participation by predetermining the need for additional evaluations?
>
> 13(iii)   Did the LEA deny Parent meaningful participation during an IEP meeting held on February 19, 2024, by (i) convening the meeting without the parent, Student, and Parent's advocate?
>
> 13(iv)   Did the LEA fail to acknowledge and include Student's medical excuses from February 2024 to May 2024 in Student's IEP and educational record? If so, did the LEA deny meaningful participation?
>
> 13(v)   Were decisions about Student's education or provision of services made outside an IEP meeting and to the exclusion of Parent? If so, was Parent denied meaningful participation?

Holding IEP Meeting in Parent's Absence

One way the parent claims the LEA denied Parent meaningful participation was to hold IEP meetings in his absence and to decide Student requires additional evaluations.

Districts must afford parents an opportunity to participate in meetings with respect to: the identification, evaluation, and educational placement of the child; and the provision of FAPE to the child.  34 C.F.R. §300.501 (b).

A district can conduct an IEP team meeting without a parent in attendance when the district "is unable to convince the parents that they should attend." 34 C.F.R. §300.322(d). When a district conducts the IEP meeting without parents in attendance, the district must keep a record of its attempts to arrange a mutually agreed on time and place, such as:

- Detailed records of telephone calls made or attempted and the results of those calls;
- Copies of correspondence sent to the parents and any responses received; and
- Detailed records of visits made to the parents' home or place of employment and the results of those visits.

34 C.F.R. §300.322 (d); *see also*, *Price v. Commonwealth Charter Acad.-Cyber Sch.*, 75 IDELR 35 E.D. Pa. 2019) (noting that a parent who refused to attend IEP meetings after a Pennsylvania charter school sent her draft IEPs for two teenagers with disabilities could not show the school denied her the opportunity to participate in the decision-making process. .Noting that the parent rejected the school's efforts to seek her input, the District Court found no evidence of an IDEA violation).

Evidence establishes Parent had an opportunity to participate in the January 3, 2024 meeting.  Specifically, Student's case manager first reached out to parent by email on November 13, 2023, about scheduling the student's annual IEP meeting.  The Annual IEP meeting to review the IEP was due by January 3, 2024. Dates and times for the meeting were proposed in the email.  Eventually, the IEP meeting was scheduled for December 14, 2023, and parent was sent notice of the meeting.  On the day of the meeting or the night before, Parent indicated on a phone call with Lead Teacher that he was unavailable.  During that telephone call, the meeting was rescheduled for January 3, 2024, the due date for the annual review of the IEP.  Lead Teacher sent Parent notice of the meeting on December 14, 2023.  Case Manager had sent several drafts of the IEP prior to December 14, 2024.    Parent then left word with staff on January 3, 2024, that he was not going to be able to make the January 3, 2024 IEP meeting.  Parent provided no reason for being unavailable.   The IEP meeting took place on January 3, 2024, and a proposed annual IEP was developed.  Lead Teacher sent an email to Parent prior to the meeting on January 3, 2024, and informed him that the meeting would proceed on January 3 as the deadline for the annual IEP had arrived.  In her correspondence, Lead teacher also informed parent that the team was willing to sit down with Parent at a later date and discuss any changes to the IEP.  On January 4, 2024, Lead Teacher sent Parent a copy of the finalized annual IEP for Student.  Again, Lead Teacher offered to sit down with Parent and to discuss the IEP and amendments if necessary.  Lead teacher provided three available dates to do so on the following week.  On January 5, 2024, Lead Teacher followed up with an email asking parent to meet and discuss the IEP and any necessary amendments.  Parent did not respond.

As previously noted, evidence also establishes Parent had an opportunity to participate in the February 19, 2024 meeting. Evidence shows LEA could not convince Parent to attend.  He would not respond to notices or correspondence asking for his availability. LEA provided evidence documenting their efforts.  LEA also provided notice of the meeting to parent.

During the February 19, 2024 IEP meeting, the members present of the IEP team discussed the need for additional evaluations.  Then as the assembled team, the team decided the evaluations that were needed.   The evidence does not show that there was a decision made outside the IEP meeting that Student required additional evaluations. Parent has not met his burden and shown that there was a predetermination for additional evaluations outside the IEP meeting and without affording the parent the opportunity to provide input.

### 13i  CSA form

Parent also contends that LEA denied meaningful participation by sending Parent a CSA consent form to sign. Evidence shows the school offered Parent school-based counseling for Student in December 2023, for 6 to 8 weeks.  Parent was sent a consent form to sign and return to permit Student to receive school-based counsel. By Parent's testimony, he did not believe the counselor had adequate training.  Parent further testified that he signed the consent form but was not able to provide supporting documentation.

Hearing Officer finds the evidence insufficient to show Parent provided consent for the counseling offered in the fall of 2023.   Having made this finding, Hearing Officer cognizant of the parent's claim that although counseling was offered, it was not available at the time.

In addition, the Hearing Officer finds the evidence irreconcilable and insufficient to establish Parent's claim that the school denied the parent meaningful participation.

### Medical Excuses

Additionally, Parent contends the LEA denied him meaningful participation by failing to acknowledge medical excuses from February 2024, to May 2024, in Student's IEP and educational records.  Presumably, Parent argues that certain medical excuses from February 2024, to May 2024, should have been made a part of Student's educational record and therefore considered by the IEP team that met on February 19, 2024.

As referenced, the relevant IEP in this claim is the one dated and developed on February 19, 2024. Medical excuses received by the LEA after the February 19, 2024 IEP meeting obviously would not have been available for review at the IEP meeting held on February 19, 2024.

The evidence does establish that by February 28, 2024, Pediatrician provided the homebound certification form to the LEA. That date post-dates the IEP proposed on

February 19, 2024 IEP.  Accordingly, the certification form could not have been considered by the IEP team as of February 19, 2024.  Less clear is when other medical documentation/excuses were supplied to the school by Pediatrician, Parent, and or Parent's advocate.  Hence, Parent is unable to meet his burden and show denial of meaningful participation because certain medical excuses were not considered by the IEP team members on February 19, 2024.

Decisions Made Outside IEP Meeting

Evidence shows that a safety plan and attendance plan were drafted outside an IEP meeting.  Also, the homebound application was denied outside the IEP meeting.

Evidence shows Safety plans are not usually provided in IEPs.  In addition attendance plans are usually not provided for in a student's IEP.  Once a student disabled or not accrues 10 absences, the VP reaches out to intervene and establish an attendance plan to address attendance.  Regarding Homebound application, the process is first the application must be approved and then submitted to the IEP team once approved.   The IEP team then determines if homebased instruction is the student's LRE.

Hearing Officer does not find the drafting of safety and attendance plans outside an IEP meeting denied Parent meaningful participation.  In fact, Parent and advocate were afforded an opportunity to participate.  Attendance plan meeting was terminated after about an hour due to the Parent and Advocate monopolizing the meeting.  Parent and Advocate could not be redirected to planning for student's attendance.  In fact Parent testified that the idea of preparing an attendance plan was "laughable."  The Safety plan meeting was ended inadvertently by the student's private counselor.  Even so, during the safety plan meeting, parent and advocate again proceeded to monopolize the meeting.  Further, the evidence is not sufficient to show VP caused Student to have a panic attack during the safety plan meeting and that caused the meeting to end.

The evidence does not show that the LEA denied Parent meaningful participation.

ISSUE 15:   Was the resolution meeting held on May 16, 2024, procedurally flawed because

- disinterested school employees were included as members of the resolution team; particularly, Stefani Rivere, Kevin Socha, Katie Wojcicki, and Katie Matheny;

- Student's case manager was not included as a member of the resolution team; and

- Parent was denied meaningful participation by the inclusion of Rivere, Socha, Wojcicki, and Matheny as resolution team members.

Did any procedural flaw of the resolution meeting constitute a denial of FAPE?

The resolution team should consist of relevant members of Student's IEP team who have specific knowledge of the facts identified in the due process notice. *See* 8 VAC 20-81-210Q. Based on the evidence presented VP, Student Services' Assistant Dir., Lead Teacher, and Dir. of SSI all have specific knowledge of the facts identified in the due process notice. Further, the evidence suggests that the named individuals are eligible to be IEP team members. *See* 8 VAC 20-81-110.

Parent has the burden of proof and has not provided sufficient evidence to show resolution members of LEA were disinterested and that Case Manager was required to be a member of the resolution team. Moreover, the evidence is not sufficient to show that by the named individuals being members of the resolution team, the LEA denied Parent meaningful participation.

In addition, the issue before the Hearing Officer involved the May 16, 2024 resolution meeting. Parent presented little to no evidence regarding the May 16, 2024 resolution meeting and its membership.

ISSUE 14:     Is compensatory education due? Specifically is private, group, individual, and grief counseling due; nursing services, recreational therapy, and a safety plan.

Hearing Officer finds no violation of FAPE. Accordingly compensatory education is not due.

## VI.     DECISION AND ORDER

The Hearing Officer considered all the evidence whether specifically mentioned or not. The Hearing Officer finds the parent has not met his burden on issues 1 through 15 for the reasons noted above.

### ORDER:

Based on the parent's failure to meet his burden, the Hearing Officer dismisses this matter with prejudice.

## VII.    PREVAILING PARTY

I have the authority to determine the prevailing party on the issues and find the prevailing party is the LEA on the issues.

## VIII.   APPEAL INFORMATION

This decision is final and binding, unless either party appeals in a federal district

court within 90 calendar days of the date of the original decision issued on July 17, 2024, or in a state circuit court within 180 calendar days of the date of this decision.

      ENTERED THIS 31st day of July 2024.

_____
Ternon Galloway Lee, Hearing Officer

Cc:    Parent
        Advocate for Parent
        Counsel for LEA
        Dir. of Special Education for LEA
        VDOE Coordinator
        Hearing Officer Monitor